UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| JOHN ROSEMOND, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No: 13-42-GFVT |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| EVA MARKHAM, et. al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

For nearly forty years, John Rosemond has written a newspaper column on parenting.  No other newspaper column written by a single author has run longer.

Now, in an exercise of regulatory zeal, the Kentucky Board of Examiners of Psychology seeks to prohibit Rosemond from publishing his column in Kentucky while referring to himself as a "family psychologist."  In an effort to avoid the State's enforcement of K.R.S. § 319.005, the State's statute regulating the practice of psychology, Rosemond protectively filed this action in which he asks that the Board be permanently enjoined from interfering with the publication of his column.  Resolution of the case requires balancing the State's interest in regulating the practice of psychology with constitutional protections of speech.  As Rosemond's speech deserves the highest level of constitutional protection, and because the State has failed to articulate compelling reasons for regulating that speech, the Board will be enjoined from further interfering with the publication of Rosemond's column.

**I**

Mr. Rosemond's newspaper column offers advice on parenting techniques and appears in over 200 newspapers across the country, including the Lexington Herald-Leader. [R. 25-3 at ¶ 6 (Rosemond Declaration).] Rosemond's column is often presented in a question-answer format, which he refers to as a "Dear Abby-style advice column[]." [*Id*. at ¶ 10.] The questions he answers are selected from "a variety of sources, including people who email [him] directly, people who attend [his] parenting seminars, and people who submit questions to [him] via [his] website." [*Id*. at ¶ 7.] Rosemond has explained his process for choosing questions and also his lack of contact with the person who submits the question as follows:

> I select questions for my column based on my judgment that they present common problems relevant to many of my readers. I usually do not know the names of people who send me questions, or any other identifying information, such as where they live. To the extent that a reader's question reveals personal information that may identify that reader, I omit such details from my column. After answering a question in my column, I do not provide any follow up, and I have no way of knowing whether the parents whose question I used read my column or followed my advice. I do not pay people for questions and they do not pay me to answer questions in my column.

[*Id*. at ¶ 8.] Rosemond is not a licensed psychologist in Kentucky, but holds a master's degree in psychology and is a licensed "psychological associate" in North Carolina. [*Id*. at ¶ 2-3.]

On February 12, 2013, the *Herald-Leader* ran one of Rosemond's columns entitled "Living with Children." [R. 1-5 at 2.] In the piece, Rosemond advised that the teenager in question, who he referred to as a "highly spoiled underachiever," was "in dire need of a major wake-up call." [*Id*.] He proceeded to describe what actions might be taken to inspire this "wake-up call," including taking away electronics and suspending him of privileges until he improved his grades. [*Id*.] The article bore the tagline: "Family psychologist John Rosemond answers parents' questions on his website at www.rosemond.com." [*Id*.] This is typical of the

taglines affixed to Rosemond's articles.  [R. 25-3 at ¶ 9 (Rosemond Declaration).]  After

Rosemond's February 12 article ran, a complaint was filed with the Kentucky Board of

Examiners of Psychology ("the Board").  [R. 25-2 at 4.]  The complainant, a formerly licensed

Kentucky psychologist, took issue with Rosemond's advice, characterizing it as "unprofessional

and unethical."  [*Id.*]  He further expressed concern that Rosemond was holding himself out to be

a psychologist in Kentucky when he was not so licensed.  [*Id.*]

As in many states, the Commonwealth has developed a statutory framework for

regulating the practice of psychology.  The crux of that framework is K.R.S. § 319.005:

> No person shall engage in the practice of psychology as defined in KRS 319.010 or
> hold himself or herself out by any title or description of services which incorporates
> the words "psychological," "psychologist," or "psychology", unless licensed by the
> board. No person shall engage in the practice of psychology in a manner that
> implies or would reasonably be deemed to imply that he or she is licensed, unless
> he or she holds a valid license issued by the board.

K.R.S. § 319.005.  The statute further defines the "practice of psychology" as:

> rendering to individuals, groups, organizations, or the public any psychological
> service involving the application of principles, methods, and procedures of
> understanding, predicting, and influencing behavior, such as the principles
> pertaining to learning, perception, motivation, thinking, emotions, and
> interpersonal relationships; the methods and procedures of interviewing,
> counseling, and psychotherapy; and psychological testing in constructing,
> administering, and interpreting tests of mental abilities, aptitudes, interests,
> attitudes, personality characteristics, emotion, and motivation. The application of
> said principles in testing, evaluation, treatment, use of psychotherapeutic
> techniques, and other methods includes, but is not limited to: diagnosis, prevention,
> and amelioration of adjustment problems and emotional, mental, nervous, and
> addictive disorders and mental health conditions of individuals and groups;
> educational and vocational counseling; the evaluation and planning for effective
> work and learning situations; and the resolution of interpersonal and social
> conflicts;

K.R.S. § 319.010(7).  Finally, the statute defines a "psychologist" as:

> any person who holds himself or herself out by any title or description of services
> incorporating the words "psychologic," "psychological," "psychologist,"
> "psychology," "psychopractice," or any other term or terms that imply he or she is
> trained, experienced, or an expert in the field of psychology.

3

K.R.S. § 319.010(9).  In the Commonwealth, if an unlicensed person engages in the practice of psychology or uses the word "psychologist" to describe themselves, then they are subject to punishment of up to six months imprisonment and/or a $500 fine. K.R.S. §§ 319.005; 319.990. The Board also has the authority to bring separate civil proceedings pursuant to the Psychology Practice Act, K.R.S. § 319.118(2).

On May 7, 2013, the Board and Kentucky's Attorney General jointly issued a "Cease and Desist Affidavit and Assurance of Voluntary Compliance" to Rosemond, hoping that he would agree to cease publishing his advice column in Kentucky as they alleged that he was engaged in the unlawful practice of psychology. [R. 1-4.]  Rosemond refused to sign.  Instead, on July 16, Rosemond sued, alleging the threat to end the publication of his column violated his First Amendment Rights to free speech. [1]  [R. 1.]  Soon thereafter, the Board and the Attorney General agreed not to exercise their statutory powers against Rosemond during the pendency of this suit. [R. 11. at 2.]  Since that time, and also by agreed order, the Attorney General has been dismissed from the suit.  [R. 17 at 2.]

The facts are not in dispute.  The parties have submitted cross-motions for summary judgment, and the Court has heard the parties' arguments, making the matter ripe for resolution. [2]

---

[1]      As stated in his complaint, Rosemond seeks declaratory and injunctive relief, asserting that (1) banning his newspaper advice column violates the First Amendment, (2) prohibiting him from referring to himself as a "psychologist" violates the First Amendment, (3) banning his books would violate the First Amendment, and (4) Kentucky's definition of the "Practice of Psychology" is overbroad. [R. 1.]  Since filing his complaint, Rosemond has abandoned his fourth claim—that the statutory definition of the "practice of psychology" is facially overbroad.  [See R. 29 at FN 10.]  Furthermore, the Court will not consider Rosemond's arguments regarding his books.  While the arguments defending the sale of his books are very similar, if not identical to the arguments addressed herein, the Court need not reach that issue as nobody has moved to remove his books from the shelves.  Any opinion issued on this topic would be advisory.

[2]      The Board's motion is titled as a Motion to Dismiss, or in the alternative, a Motion for Summary Judgment.  [R. 26.]  As the parties both cite to matters outside the pleadings in their briefing, the Court

**II**

Rosemond originally sought to challenge Kentucky's regulations both *facially* and *as-applied*. [R. 1 at 27.] Since that time he has abandoned his facial challenge and now he only argues that the Board's actions are unconstitutional *as-applied* to him. [R. 32 at 5.] To be clear, Rosemond does not challenge whether Kentucky may regulate the practice of psychology. Furthermore, the Board does not deny that its cease and desist order would have the effect of restricting Rosemond's speech. What the parties disagree about is the nature of the restriction. Rosemond argues that the Board's regulation of his column is a content-based restriction on his speech. The Board argues that its regulation is not content-based, but rather is a *professional regulation* barring conduct (i.e. practicing psychology without a Kentucky license) and that any stifling of speech that results from the enforcement of K.R.S. § 319.005 is merely incidental to the state's legitimate aim of regulating the profession. [R. 30 at 6-8.] The Board argues that because Rosemond's speech is either *commercial* or *professional*, its regulation of that speech should only be subject to intermediate scrutiny. Despite the aforementioned differences of opinion as to what framework applies, the parties agree that this dispute is governed by the First Amendment. [R. 47 at 2 (Hrg. Tr.)]

**A**

The cease and desist letter issued by the Board addressed both Rosemond's unauthorized practice of psychology and his use of the title "psychologist" even though he is not credentialed by the Kentucky Board. [R. 1-4.] The parties analyze the restrictions separately in their briefing

---

considers these motions solely as cross-motions for summary judgment. The Board appears to concede this point as the last line of their reply brief states that "Summary Judgement in favor [of] the Defendants is warranted." [R. 33 at 9.]

and, because these restrictions potentially implicate separate constitutional questions, the Court will similarly divide the inquiry.

## 1

Rosemond argues the Board's regulation of the advice he provides in his column amounts to a content-based restriction that warrants strict scrutiny.  [R. 25-1 at 14-17.]  The Board contends the restriction is not content-based, and is only a restriction on either commercial or professional speech.  Rosemond is right.

In *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218, 2227 (2015), the Supreme Court very recently discussed the test for determining whether a restriction on speech is content-based:

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. *E.g., Sorrell v. IMS Health, Inc.,* 564 U.S. ——, —— – ——, 131 S.Ct. 2653, 2663–2664, 180 L.Ed.2d 544 (2011); *Carey v. Brown,* 447 U.S. 455, 462, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); [*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)]. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. *Sorrell, supra,* at ——, 131 S.Ct., at 2664. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

*Reed*, 135 S. Ct. at 2227.

Rosemond was asked to cease publishing his column because he responded "to a specific question from a parent about handling a teenager," an action which the Board deemed a "psychological service."  [R. 1-4.]  As was conceded in the hearing on this matter, the Board would not have intervened if Rosemond was providing generalized advice about child rearing as it would then fall "outside the practice of psychology." [R. 47 at 24 (Hrg. Tr.)]  The Board is adamant that it "takes no issue with the quality of the psychological services or the applicable

standard of care," [R. 1-4] but this protestation does not change the fact that the Board sought to silence Rosemond because of the content of his speech. Only because Rosemond provided individualized advice was he subject to the Board's action. This is, by definition, content-based.

Although the factual predicate is very different, the Supreme Court's opinion in *Holder v. Humanitarian Law Project,* 561 U.S. 1, 28 (2010) is instructive. In that case, the Court considered whether 18 U.S.C. § 2339B(a)(1), which criminalizes "knowingly provid[ing] material support or resources to a foreign terrorist organization," was applied in such a way as to violate the First Amendment rights of American citizens who wished to "provide material support to [Terrorist Organizations] in the form of speech." *Id.* at 28. As here, the Government argued that what was at issue was conduct, not speech. The Court dismissed this argument, finding that the restriction was content-based:

> Plaintiffs want to speak to the [Terrorist Organizations], and whether they may do so under [the material support statute] depends on what they say. If plaintiffs' speech to those groups imparts a "specific skill" or communicates advice derived from "specialized knowledge"—for example, training on the use of international law or advice on petitioning the United Nations—then it is barred. . . . On the other hand, plaintiffs' speech is not barred if it imparts only general or unspecialized knowledge.

*Id.* (internal citations omitted). As in *Holder*, Rosemond wants to write a newspaper column and whether the Board will permit him to do so depends on what he says in that column.

When the Court in *Holder* was confronted with the Government's argument, which is similar to the Board's herein, that the material support statute should only receive intermediate scrutiny since it "*generally* functions as a regulation of conduct," the Court refused to adopt this position, explaining that a law may be "described as directed at conduct . . . , but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." 561 U.S. 1, 28 (2010); *see also United States v. Baumgartner*, 581 F. App'x 522, 530

(6th Cir. 2014) (quoting *Holder,* 561 U.S. at 28) ("The Supreme Court has held that, where a statute 'may be described as directed at conduct ... but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message,' the application of the statute is subject to strict scrutiny for compliance with the First Amendment.").  There is no question that what drew the Board's attention in this case was Rosemond's communicating of a message.  The letter of complaint which spurred the Board's action specifically criticizes his advice, and the cease and desist letter addresses the Board's concern that he was responding to a specific, individualized question.  [R. 1-4; R. 25-2 at 4.]

As further evidence of the fact that the restriction is content-based, Rosemond points out that there is "no content-neutral justification—i.e., no rationale unrelated to the topics discussed in his column—for regulating what he writes."  [R. 25-1 at 16.]  The Board confirms as much in its answers to interrogatories where, despite stating that it "[does] not take a position on the content of the article," it explains that "[b]y describing himself as a family psychologist, [Rosemond] is misleading and deceitful to the Kentucky readers who could infer that he is a qualified credential holder of the Board. . . **which could result in [their] acting upon the printed advice and harm**."  [R. 25-2 at 78 (emphasis added).]  In other words, the Board acted out of a concern that the content of Rosemond's advice column might harm Kentucky readers.

The Board disagrees, arguing that Rosemond's advice column was either commercial or professional speech, and that their restriction was content-neutral.  [R. 26-1 at 9- 12 (arguing Rosemond's speech is commercial); R. 30 at 5-9 (arguing Rosemond's speech is either commercial or professional); R. 33 at 4 (arguing that Rosemond's advice column is professional speech).]  The advice rendered in Rosemond's column falls into neither category.

Commercial speech does "no more than propose a commercial transaction," *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762 (1976) or is an "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980). The Board provides only one argument in support of its belief that Rosemond engages in commercial speech when he publishes his column: Rosemond's tagline refers readers to his website, which contains "revenue generating activities." [R. 26-1 at 10.] This is unpersuasive. "Rosemond [does] not pay people for questions and they do not pay [him] to answer questions in [his] column." [R. 25-3.] While Rosemond was undoubtedly paid for his syndicated column, and might have indirectly received some income from his website, it cannot be said that Rosemond's column either "propos[ed] a commercial transaction" or was "related solely to the economic interests of the speaker and its audience." *Virginia State Bd. of Pharmacy,* 425 U.S. at 762; *Cent. Hudson*, 447 U.S. at 561.

The Board also argues that Rosemond's speech is deserving of a lesser constitutional protection because he was engaging in *professional speech*. Citing no case in support of this specific proposition, the Board pronounces the rule that "[a] professional in a regulated profession does not enjoy the full protection of the First Amendment when speaking as part of the practice of his profession." [R. 33 at 3 (emphasis added).] If there is a rule to be taken from the cases addressing the "professional speech" doctrine, it is far more nuanced than this.

The Board correctly notes that "[t]he "professional speech doctrine" aims to reconcile the "collision between the power of government to license and regulate those who would pursue a profession ... and the rights of freedom of speech."" [R. 33 at 3 (citing *Lowe v. S.E.C.,* 472 U.S. 181, 228 (1985) (White, J., concurring).] It is not surprising that the Board has difficulty citing

to a case that lays the theory out in a coherent way, because cases addressing the intersection

between professional speech and the first amendment are few and far between.  *See* Daniel

Halberstam, *Commercial Speech, Professional Speech, and the Constitutional Status of Social*

*Institutions*, 147 U. Pa. L. Rev. 771, 834 (1999) (Courts have "rarely addressed the First

Amendment contours of a professional's freedom to speak to a client.")  According to

Halberstam's Article, the Supreme Court has only once "expressly confront[ed] the First

Amendment protection of professional speech" and, in only three cases have they reviewed

professional restrictions in light of First Amendment challenges.  *Id*. at 773, 834.  In *Planned*

*Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), the Supreme Court

upheld a Pennsylvania law that required physicians provide information to clients seeking an

abortion.  While not naming it, the Court addressed the *professional speech* doctrine as follows:

> To be sure, the physician's First Amendment rights not to speak are implicated, see
> *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), but only
> as part of the practice of medicine, subject to reasonable licensing and regulation
> by the State, cf. *Whalen v. Roe,* 429 U.S. 589, 603, 97 S.Ct. 869, 878, 51 L.Ed.2d
> 64 (1977). We see no constitutional infirmity in the requirement that the physician
> provide the information mandated by the State here.

*Id. at* 884.  The second case that Halberstam refers to is *Rust v. Sullivan*, 500 U.S. 173 (1991),

where the Court did not discuss professional speech, but did uphold a rule preventing

government-funded clinics from advising patients of services related to "abortion as a method of

family planning."  *Id*. at 193.  Finally, in *Lowe v. S.E.C.*, 472 U.S. 181 (1985), the Supreme

Court considered whether an SEC order prohibiting a former investment adviser from publishing

an SEC newsletter was an abridgment of the former adviser's freedom of speech.

Admittedly, at what point professional regulation becomes an unconstitutional restriction

on speech is a difficult question to answer.  It has long been held that "[s]tates have a compelling

interest in the practice of professions within their boundaries, and that as part of their power to

protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975).  This principle is unassailable.  But, also undeniable is the fact that, "[a]t some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press; beyond that point, the statute must survive the level of scrutiny demanded by the First Amendment."  *Lowe,* 472 U.S. at 229-30.  Again, where to draw this line is not an exact science.  In his concurring opinion in *Lowe*, Justice White provided some insight on this question:

> Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command that "Congress shall make no law ... abridging the freedom of speech, or of the press."

*Id.* at 232.  This theory is both consistent with how the doctrine has been applied in the aforementioned cases addressing the *professional speech* doctrine, and is also sensible in light of the doctrine's aims.  Pursuant to this doctrine, the government is permitted to regulate speech in limited circumstances so as to protect the individual receiving advice— the client.  As articulated by Justice White, without this professional-client relationship, the doctrine's vices outweigh its virtues.

In this case, that "personal nexus between professional and client" does not exist.  *Id.* Neither party suggests that Rosemond has any idea who the teenager in his column is.  In fact, nobody knows the individual who Rosemond was writing about or whether that person lives in Kentucky.  [R. 26-3 at 21 (Markham Depo.)]  Nobody knows if the teenager's parents read the article or took the advice, much less if anyone was harmed.  For all the Board knows, the "wake-up call" worked and, instead of harming the teenager, it served its purpose.  Furthermore,

11

Rosemond receives no compensation from any person in exchange for the advice offered in his columns.  [R. 25-3 at 2 ("I do not pay people for questions and they do not pay me to answer questions in my column.")]  Put plainly, the question and answer format used by Rosemond is nothing more than a literary device.  The relationship that is necessary between a professional and a client to trigger application of the *professional speech* doctrine just did not exist.  This should not come as much of a surprise to the Board, who conceded in oral argument that it knew of no case that defined professional speech in the way the Board sought to apply the doctrine. [R. 47 at 5 (Hrg. Tr.)]

The Board cites to a number of cases where professionals have been regulated in the interest of protecting the public, and Courts have upheld the restrictions as they had only incidental effects on the free speech rights.  [*See* R. 33 at 5-6.]  These cases are all distinguishable from the one before the Court.  For example, in *Ohralik v. Ohio State Bar Association*, the Supreme Court considered whether an attorney could be disciplined for personally soliciting automobile victims, or whether this conduct constituted protected speech. 436 U.S. 447 (1978).  The Court found that the conduct "f[ell] within the State's proper sphere of economic and professional regulation," because "[a] lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns." *Id*.  at 459. Because Rosemond's column is not commercial, it is not fairly compared to Ohio's regulation of an attorney's practices in soliciting clients.  Two cases that the Board cites actually support Rosemond's position by endorsing Justice White's concurring opinion in *Lowe* that there must be a nexus between a professional and a client to legitimate professional regulations with such an impact on speech.  *See Accountant's Soc'y of Virginia v. Bowman,* 860 F.2d 602 (4th Cir. 1988) (Regulations affecting accountants are constitutional as they "restrict[] only accountants'

communications with and on behalf of their clients."); *Locke v. Shore,* 634 F.3d 1185 (11th Cir. 2011) ("There is a difference, for First Amendment purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients.")

      For the reasons explained above, Rosemond's speech is neither commercial, nor professional.  Instead, the Board used K.R.S. § 319.005 to restrict Rosemond's speech because it took issue with the message he was conveying.  Such government regulation is content-based, and only constitutional if it survives strict scrutiny.

**2**

      The Board also argues that the tagline at the bottom of Rosemond's column is commercial speech, and further that Rosemond's "*unqualified* use" of the term *family psychologist* is "potentially misleading, to the public's detriment."[3]  [R. 30 at 10.]  For the same reasons that the Board's attempted regulation of the body of Rosemond's column is content-based, so too is its regulation of his tagline.  If Rosemond described himself as something other than a "family psychologist," or qualified his statement, then the Board would not have pursued him.  [*See* R. 47 at 6 (Hrg. Tr.) (Board stating "[i]f he called himself a family therapist, we would not be here.")]  As discussed, *supra*, this is the hallmark of a content-based restriction.  *See Reed,* 135 S. Ct. at 2227 ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.")

      The fact that the Board seeks to regulate the way that Rosemond describes himself as opposed to what he says in the column, does not change the fact that it is content-based.  In *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 348 (1995), the Supreme Court considered whether an Ohio law that prohibited anonymous campaign literature was an unconstitutional

---

[3]     Rosemond's tagline states: "Family psychologist John Rosemond answers parent's questions on his website at www.rosemond.com." [R. 1-5 at 2]

13

abridgment of free speech.  Ohio argued that the regulation was justified because it provided the electorate with valuable information about the speaker, but the Court disagreed:

> Insofar as the interest in informing the electorate means nothing more than the provision of additional information that may either buttress or undermine the argument in a document, we think the identity of the speaker is no different from other components of the document's content that the author is free to include or exclude.[ 1 ] . . . .  The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit.

*Id.* at 348-49.  If the state wants to regulate what facts are to be included about the identity of a speaker, then that regulation is content-based and must withstand strict scrutiny.  *Id*.

Even if, as the Board claims, Rosemond is potentially misleading readers by holding himself out as a psychologist, he retains the First Amendment right to make those statements in a non-commercial setting.  K.R.S. § 319.005 bans individuals from using the term "psychologist" in a way that is deceptive.  According to the Board, "[t]he evidence in this case supports the ban that the *unqualified* use of those terms as potentially misleading, to the public's detriment."  [R. 30 at 10.]  While not a licensed psychologist in Kentucky, Rosemond does hold a master's degree in psychology and is a licensed "psychological associate" in North Carolina.  [R. 25-3 at ¶ 2-3 (Rosemond Declaration).]  With this title, also comes authorization under North Carolina law to describe himself as a "psychologist."  [*Id*. at ¶ 3; R. 1 at ¶ 10.]  Ultimately, however, the Board's restriction is subject to strict scrutiny even if what Rosemond said were false or misleading.  [R. 25-1 at 15.]  In *United States v. Alvarez*, 132 S. Ct. 2537 (2012), Xavier Alvarez lied when he announced at a public meeting that he held the Congressional Medal of Honor, an act which the Court referred to as a "pathetic attempt to gain respect that eluded him."  *Id*. at 2542.  In holding that *The Stolen Valor Act*, which criminalized making false claims about the receipt of military medals, was an unconstitutional content-based restriction, the Court reaffirmed its conviction that even false statements deserve First Amendment protection:

14

> The Nation well knows that one of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace. Though few might find respondent's statements anything but contemptible, his right to make those statements is protected by the Constitution's guarantee of freedom of speech and expression.

*Id.* at 2551.  The Board's restrictions imposed on his tagline, like the content of his column, must also survive strict scrutiny if they are to be permitted.

B

As the Board has imposed "content-based restrictions on speech, those provisions can stand only if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Reed*, 135 S. Ct. at 2231 (internal quotation marks and citations omitted); *see also Greater New Orleans Broad. Association, Inc. v. United States,* 527 U.S. 173, 183 (1999) (When considering restrictions on "commercial" speech, "the Government bears the burden of identifying a substantial interest and justifying the challenged restriction."); *see also Ohio Citizen Action v. City of Englewood,* 671 F.3d 564, 571 (6th Cir. 2012) ("The governmental entity that enacts the regulation bears the burden of establishing each element of the analysis, and 'the Court ordinarily does not supply reasons the legislative body has not given.' ").  This means that the burden is on the Board to demonstrate that the restrictions imposed on Rosemond's speech "furthers a compelling governmental interest and [are] narrowly tailored to that end."  *Reed*, 135 S. Ct. at 2231 (internal quotation marks and citations omitted).  "In light of the substantial and expansive threats to free expression posed by content-based restrictions," *Alvarez*, 132 S. Ct. at 2544, the Supreme Court has only rarely found content-based restrictions to withstand constitutional muster.  *Id.* (collecting cases).  The Board cannot carry this heavy burden here.

**1**

First, the Board argues that Kentucky has a compelling interest in "protect[ing] the public health and safety and other interests by establishing standards for licensing professionals and by regulating the practice of professions within their borders." [R. 30 at 9.]  They assert that the regulatory scheme "protect[s] the mental health of its citizens and prevent harm from the unlawful and incompetent practice of psychology."  [R. 33 at 6.]  The Board asserts that Rosemond might potentially confuse readers into believing that he is a Kentucky-licensed psychologist and that protecting these readers from potential confusion is a compelling interest. [R. 33 at 8.]

This interest does not fall into one of the few categories where the law allows content-based regulation of speech.  *See Alvarez*, 132 S. Ct. at 2544.  Furthermore, while *protecting the public* is an enviable goal, the Board cannot demonstrate that its restrictions achieve the goal. Even under the lesser *intermediate scrutiny* standard, the Board has the burden of demonstrating that its restriction "directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson Gas & Electric Corp.,* 447 U.S., at 564.  As explained in *Edenfield v. Fane*, "[t]his burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on [ ] speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." 507 U.S. 761, 770-71 (1993); *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir. 2007) (citing *Edenfield,* 507 U.S. at 770–72) ("[T]he government must come forward with some quantum of evidence, beyond its own belief in the necessity for regulation, that the harms it seeks to remedy are concrete and that its regulatory regime advances the stated goals.")*; Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 392

16

(2000) (The Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden.").

    In the case at hand, the Board has not demonstrated that any actual harm has occurred.  In fact, the Board conceded it is not aware of any situation where a citizen was actually harmed by Rosemond's speech.  [R. 47 at 16 (Hrg Tr.)]  When asked in her deposition whether the Board was "aware of any evidence that anyone has been harmed by Mr. Rosemond's column in the more than forty years that it has run in Kentucky newspapers," Dr. Eva Markham (Chair of the Kentucky Board of Examiners of Psychology) answered "not to my knowledge."  [R. 26-3 at 26 (Markham Depo.)]  When asked whether the Board was aware of anyone being misled by his tagline, the answer was again "No."  [R. 26-3 at 26 (Markham Depo.)]  Instead, the Board only speculates that citizens might be harmed if they were to depend on Rosemond's advice under the mistaken belief that he is a Kentucky-licensed psychologist.  [R. 47 at 15 (Hrg. Tr.); R. 26-3 at 22-23 (Markham Depo.)]

    The Board's argument that no proof of actual harm is necessary, and that speculative harm is enough is unpersuasive.  [R. 33 at 4.]  Citing *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994), the Board argues that the state can act to regulate "anticipated harms."  [R. 33 at 4, Footnote 16.]  A more complete reading of *Turner Broadcasting* reveals, however, that the Government must still do "more than simply 'posit the existence of the disease sought to be cured.' "  *Turner Broad. Sys.*, 512 U.S. at 664 (1994) (quotation omitted).  The Government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Id.* (citing *Edenfield,* 507 U.S. at 770–771 (1993)); *see also United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 475 (1995) (quoting *Turner Broad. Sys.*, 512 U.S. at 664).

17

**2**

Second, even if the Board's interest were compelling, its restrictions are not narrowly tailored to achieve its purpose.   [R. 25-1 at 23.]  The Board argues that its restrictions are narrowly tailored because Rosemond could easily and without much effort choose to describe himself as something other than a "family psychologist," or he could simply qualify his tagline by noting that he is not licensed in Kentucky.  [R. 33 at 9 ("The Statute is not excessive.  It does not prevent the Plaintiff from using any other myriad of terms to describe himself or his background until he is licensed by the Board."); R. 47 at 39 (Hrg. Tr.) ("He can hold himself out as a family therapist, family counselor, or anything else along those lines, but he just can't hold himself out as a family psychologist…")]  The Court is sympathetic to the Board's position; if Rosemond chose to make subtle changes in the way that he refers to himself, this litigation would not be necessary.  [*See* R. 47 at 6 (Hrg. Tr.) (Board stating "[i]f he called himself a family therapist, we would not be here.")]  This does not make the Board's restriction "narrowly tailored."  Ultimately, whether or not Rosemond could choose to describe himself differently or in a way that the Board believes to be more precise is irrelevant because, as explained *supra*, Rosemond's use of the title "family psychologist" is protected by the first amendment.  *See McIntyre,* 514 U.S. at 348.  As Rosemond argued in his motion, there are other ways to achieve the same purpose.  For example, the Board could publish a list of names of psychologists licensed by the Commonwealth.  [R. 32 at FN4.]

In this case, it would additionally seem that the Board's enforcement is underinclusive. Laws that are underinclusive cannot be narrowly tailored "[b]ecause a law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited."  *Reed*, 135 S.

Ct. 2232 (quoting *Republican Party of Minn. v. White,* 536 U.S. 765, 780 (2002) (internal

quotation marks omitted).  As articulated by Rosemond:

> [T]here is no legitimate neutral justification for the fact that Kentucky prohibits
> Plaintiff Rosemond's parenting advice while leaving vast amounts of materially
> identical speech—in the form of newspapers, books, television shows, and Internet
> discussion forums— totally unregulated. Kentucky's newspapers and airwaves—
> not to mention the Internet—are filled with advice personalities answering
> questions on every facet of interpersonal relationships, most of which seemingly
> fall within the broad scope of Kentucky's definition of the "practice of
> psychology."

[R. 25-1 at 23-24.]  If the State's interest is really in preventing persons unlicensed in the

Commonwealth of Kentucky from holding themselves out as licensed professionals, it is difficult

to understand how Dr. Phil, Dr. Oz, and countless other self-help gurus would not also be in the

Government's crosshairs.  The Board has never investigated another newspaper columnist, nor

book author for holding themselves out to be a "psychologist" without proper licensure in

Kentucky. [R. 26-3 at 23-24 (Markham Depo.)]  When asked how the Board would respond to a

complaint if one were levied against Dr. Phil, the Board did not know.  [*Id*. at 35.]  While there is

no evidence in the record demonstrating that other public personalities similarly hold themselves

out to be "psychologists" in Kentucky, it is hard to believe that others do not.

### C

As explained *supra*, Rosemond's speech is neither commercial, nor professional because

it neither proposes a commercial transaction, nor is there any nexus between Rosemond and the

person to whom his advice is allegedly directed.  Nevertheless, even if the Court were to find

that Rosemond was engaging in either commercial or professional speech, the restriction would

still fail because the Board's regulatory authority is not without limits.  As explained *supra,* "a

governmental body seeking to sustain a restriction on commercial speech must demonstrate that

the harms it recites are real and that its restriction will in fact alleviate them to a material

degree." *Edenfield*, 507 U.S. at 770-71 (additional citations omitted).  The same burden attaches

to the Board's regulation of Rosemond's tagline.  Even if the tagline constituted potentially

misleading commercial speech, without more it cannot survive intermediate scrutiny:

> If the "protections afforded commercial speech are to retain their force," *Zauderer,*
> 471 U.S., at 648–649, 105 S.Ct., at 2280–2281, we cannot allow rote invocation of
> the words "potentially misleading" to supplant the Board's burden to "demonstrate
> that the harms it recites are real and that its restriction will in fact alleviate them to
> a material degree." *Edenfield,* 507 U.S., at 771, 113 S.Ct., at 1800.

*Ibanez v. Florida Dep't of Bus. & Professional Regulation, Bd. of Accountancy*, 512 U.S. 136,

146 (1994).  As has been demonstrated, the Board has failed to show that any actual harm

resulted from Rosemond's behavior or that any anticipated harm was more than conjectural.  As

such, the Board could not even meet the lesser burden imposed by an intermediate scrutiny

analysis.

### III

The Court does not herein seek to restrain the Board's ability to regulate the practice of

psychology.  Furthermore, the Court does not question the Board's motives, but "[t]he vice of

content-based legislation ... is not that it is always used for invidious, thought-control purposes,

but that it lends itself to use for those purposes."  *Reed*, 135 S. Ct. at 2229 (quoting *Hill v.*

*Colorado*, 530 U.S. 703, 743 (2000) (Scalia, J., dissenting)) (internal quotation marks omitted).

In this instance the Board went too far.

Rosemond is entitled to express his views and the fact that he is not a Kentucky-licensed

psychologist does not change that fact.  If the facts were different, had Rosemond represented

himself to be a Kentucky-licensed psychologist or had he actually entered into a client-patient

relationship in Kentucky, the outcome might be different.  In the case at hand, he did not.  All he

did was write a column providing parenting advice to an audience of newspaper subscribers.  To

permit the state to halt this lawful expression would result in a harm far more concrete and

damaging to society than the speculative harm which the State purportedly seeks to avoid, and perhaps that is the "wake up" call best drawn from the facts of this case.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

(1)   Rosemond's Motion for Summary Judgment [R. 25] is **GRANTED;**

(2)   The Board's Motion for Summary Judgment [R. 26] is **DENIED**;

(3)   Kentucky's Psychology Practice Act, Ky. Rev. Stat. §§ 319.005 *et seq.*, and its Associated regulations were **UNCONSTITUTIONALY APPLIED** to Rosemond's advice column and also as to Rosemond's description of himself as a family psychologist;

(4)   The Board is **PERMANENTLY ENJOINED** from enforcing these laws in an unconstitutional manner against Rosemond or others similarly situated; and,

(5)   The Court will enter an appropriate judgment contemporaneously herewith.


This 30th day of September, 2015.


Signed By:

*Gregory F. Van Tatenhove*

United States District Judge